# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Aragon,<br><br>   Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of the Social Security Administration,<br><br>   Defendant. | No. CV-10-0307-TUC-CKJ-DTF<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Richard Aragon brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision by the Commissioner of Social Security (Commissioner). This case presents five issues on appeal: whether substantial evidence supports the Administrative Law Judge (ALJ)'s Residual Functional Capacity (RFC) assessment; whether the ALJ erroneously evaluated Aragon's onset date and Dr. Silver's report; whether the ALJ erred in evaluating Dr. Escobar's opinion; whether the ALJ erred in his evaluation of lay witness testimony; and whether the ALJ provided clear and convincing reasons for finding Aragon not credible.

Plaintiff filed his opening brief (Doc. 16), the Commissioner filed an opposition (Doc. 17) and Plaintiff replied (Doc. 18). Based on the pleadings and the administrative record submitted to the Court, the Magistrate Judge recommends the District Court, after its independent review, deny Aragon's request for relief.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for supplemental security income (SSI) on July 13, 2006.

1  (Administrative Record (AR) 99.) Plaintiff alleged disability from January 15, 2005. (AR
2  99.) A hearing was held on December 4, 2007, after which ALJ Milan M. Dostal found, at
3  step five, that Plaintiff was not disabled because he could perform work available in the
4  national economy. (AR 16-27.) Aragon submitted, and the Appeals Council considered,
5  additional evidence. (AR 4.) The Appeals Council denied Plaintiff's request to review the
6  ALJ's decision. (AR 1.)

## II. FACTUAL HISTORY

8  Plaintiff was born on May 5, 1961, making him 43 years of age at the onset date of
9  his alleged disability. (AR 99.) Aragon worked consistently from 1984 to 1997, as a heavy-
10  equipment operator, after which he has had no reported income from employment. (AR 104,
11  106, 108-09, 122-23.) He stopped working on September 1, 1997, a few months after he was
12  electrocuted on the job. (AR 122.)

### A. Examining Physicians

14  On May 12, 1998, Dr. Silver conducted an examination of Aragon and found that he
15  had full range of motion in his spine, straight leg raise was negative, and reflexes were 2+.
16  (AR 313-14.) He diagnosed nonanatomical hypesthesia of the right lower extremity, carpal
17  tunnel syndrome and canal de Guyon syndrome on the right side. (AR 314.)

18  Dr. Dennis Thrasher examined Aragon on October 25, 2006. Aragon reported that,
19  shortly after he was electrocuted, nerve conduction testing was normal. (AR 251.) At the time
20  of his exam with Dr. Thrasher, Aragon was not under the care of a doctor and was taking no
21  medication, but he was seeing a chiropractor weekly. (*Id.*) Dr. Thrasher noted that Aragon
22  had a normal gait and posture, and that he did not demonstrate any impairment although he
23  displayed "pain behaviors." (AR 252.) Aragon's straight leg raise was normal when sitting
24  and supine, his deep tendon reflexes were 3+ symmetric, and light touch sensation was intact
25  on hands and feet. (*Id.*) Dr. Thrasher reviewed a lumbar spine x-ray (AR 257), which
26  revealed mild to moderate narrowing of the L5-S1 disc space, evidencing moderate
27  degenerative disc disease (AR 253). There was no evidence of radiculopathy or impingement

in range of motion. (*Id.*)

Dr. Thrasher concluded that Aragon could occasionally lift 50 pounds and frequently lift 25 pounds. (AR 254.) Dr. Thrasher found no limitations in Aragon's ability to stand, walk or sit. (AR 254-55.) He found that Aragon could occasionally climb ladders/ropes/scaffolds, kneel, crouch and crawl, and could frequently climb ramps/stairs, stoop, reach, handle, finger and feel. (AR 255.) Dr. Thrasher completed a range of motion assessment for Aragon's shoulders, elbows, wrists, hips, knees and ankles and found no limitations. (AR 262.)

Aragon was examined by Dr. Pedro Luis Escobar on July 12, 2007. Dr. Escobar found that Aragon had a reduced range of motion, his muscle strength was 4/5 in the extremities, and his reflexes were 2+ in the lower and 1+ in the upper extremities. (AR 318.) He tested positive for thermal, chemical and mechanical allodynia, and Raynaud's phenomenon in his right and left hand. (*Id.*) Dr. Escobar diagnosed Aragon with complex regional pain syndrome type I of the upper and lower right extremities. (*Id.*)

Dr. Escobar opined that Aragon could not do even sedentary work full or part time, and that he would miss six or more days per month. (AR 343.) More specifically, he concluded that Aragon could stand for 15 minutes at one time for a total of 2 hours, could sit for 15 minutes at one time for a total of 3-4 hours, and walk for 10-15 minutes at a time for a total of 1-2 hours. (*Id.*) The doctor determined that Aragon should avoid bending, crouching, kneeling, squatting, reaching above shoulder level, working with arms extended, and most right hand activities. (AR 344.)

On January 21, 2008, Aragon had an MRI which indicated degenerative disc disease at C5/6 (moderate right foraminal stenosis and mild narrowing of the right aspect of the central canal) and C6/7 (moderately severe right foraminal stenosis). (AR 347.)

On January 2, 2008, Aragon saw a new doctor Dr. Dean H. Branson, Jr. who noted decreased sensation in the upper and lower extremity. (AR 351.) Dr. Branson prescribed gabapentin and recommended a neurosurgical second opinion. (AR 352.) In a follow-up on June 4, 2008, Dr. Branson noted that Aragon improved through chiropractic care but the relief was not complete; he increased the gabapentin amount. (AR 354-55.)

### B. Chiropractor

Chiropractor Philip Aragon provided Aragon regular treatment from November 2001 to March 2004 (AR 304-311) and from November 2005 to March 2007 (AR 294-97). Dr. Aragon diagnosed Aragon with lumbar subluxation with a radicular neuralgia in the lower extremity, chronic subluxations of the cervical spine with radicularopathy into the arms, thoracic spine and pelvis. (AR 346.) Dr. Aragon stated that Aragon's pain limits his abilities, and even basic activities will render him in pain for days. (*Id.*) Dr. Aragon agreed with the limitations found by Dr. Escobar in July 2007. (*Id.*)

### C. Plaintiff's Testimony

On August 28, 2006, Aragon completed a function report in which he indicated that he is limited in what he can do by pain in his lower back, and right arm and leg. (AR 140-49.) Specifically, he does not cook as much, is unable to do many hobbies, cannot sit or stand for long, and his ability to lift, squat, bend, reach, walk, kneel, and stair climb are affected. (AR 144-47.) Aragon submitted a second function report on March 11, 2007, which described a similar level of limitation in his daily living activities. (AR 184-91.)

At the December 4, 2007 hearing, before ALJ Dostal, Aragon testified that he stopped working in 1997 after he got injured. (AR 34-35.) He tried working for a few months for a construction company but could only do one to two hours and they let him go because he could not work consistently. (AR 35, 43.) Aragon stated that he had not taken any medication for the prior two years, when Dr. Sowers had prescribed a pain medication to which he was allergic. (AR 36.) Aragon testified that he had pain in his right arm and leg, lower back, and neck. (*Id.*) He stated that he could stand and/or sit for about 30 minutes at a time, he walked 5 to 10 minutes a day but his right leg would go numb and sometimes it gave out on him. (AR 38, 41, 45.) Aragon stated that his right arm doesn't have the strength of his left, it is colder, and when he uses his right hand it will become weak. (AR 38, 44.) He indicated that he has constant pain, which is aggravated by being in the sun. (AR 45.) He testified that he has trouble sleeping, difficulty concentrating, and suffers from fatigue. (AR 45-46.) He described his pain as feeling like being stuck with an ice pick, and at the level of a 4 or 5 on

- 4 -

1    most days but it increases to an 8 or 9 with exertion. (AR 46-47.) He periodically goes
2    hunting with his friends but he only hangs around the camp or uses the binoculars for the
3    hunters. (AR 39-40, 42.)

4        Aragon testified that he had been receiving chiropractic care free from his nephew.
5    (AR 44.) Aragon indicated Dr. Thrasher examined him for approximately 20 minutes, while
6    Dr. Escobar spent about 2 hours with him. (*Id.*)

7    **D. Lay Testimony**

8        On August 28, 2006, Aragon's father, Alfred Aragon, completed a function report.
9    His father reported that sometimes pain prevented Aragon from sleeping, and it limited the
10   amount of time he could spend on work in the house and yard, as well as how long he could
11   lift, squat, bend, stand, walk, sit, kneel or climb stairs. (AR 132-39.)

12       On May 18, 2007, Vicky Nickerson, Aragon's friend, wrote a letter stating that
13   Aragon is in constant pain and she has helped him with household jobs and to move because
14   he is unable to do those things. (AR 324.) On July 6, 2007, Aragon's friend Maria Elena
15   Sandoval submitted a letter stating that Aragon had seen doctors in effort to be diagnosed,
16   had experienced a lot of pain and suffering and was unable to work. (AR 321.) On July 9,
17   2007, Aragon's uncle, Larry Pina, opined that Aragon's abilities had changed dramatically
18   and he could no longer do simple tasks or use his hands as he used to do. (AR 325.) In July
19   2007, Aragon's friend Catherine Jaurigue wrote a letter stating that after the electrical
20   accident, Aragon's body wasted away, he suffered from significant pain, and he was unable
21   to work. (AR 322.) In a letter dated July 17, 2007, Aragon's niece, Erica M. Seehaver,
22   reported that Aragon could only work a few hours at a time and it would cause pain for
23   several following days. (AR 323.)

24   **E. Vocational Evidence**

25       At the hearing before the ALJ, Stacie Chaunbreath testified as a vocational expert.
26   (AR 48.)  She reported that Aragon's work as a heavy equipment operator was medium
27   exertion and semi-skilled, and he would not be able to do that job with his current limitations.
28   (AR 49, 50.) In response to hypotheticals by the ALJ, Chaunbreath  testified that a person

1  with Aragon's age, education and background, who could frequently lift 10 pounds, could
2  occasionally lift 20 pounds, kneel, crouch or crawl, must avoid climbing
3  ladders/ropes/scaffolds and extreme temperatures, has some numbness in his leg and hand,
4  has slight or moderate pain, and fatigue and psychiatric problems with a slight impact on
5  basic work activities could work as a cashier or in retail sales. (AR 50-52.) If the person had
6  the same limitations but with severe, uncontrolled pain he would be unable to do those jobs.
7  (AR 52.) Chaunbreath stated that a person with the RFC set forth by Dr. Escobar could not
8  work because of the rate of absenteeism and the inability to do sedentary work even part
9  time. (AR 52-53.) Crediting all of Aragon's testimony at the hearing, she stated that he would
10 not be able to perform the two jobs she had identified, cash or retail sales. (AR 53.)

### F. ALJ's Decision

The ALJ found Aragon had one severe impairment, degenerative disc disease. (AR 21.) The ALJ found that Aragon's statements regarding the effect of his symptoms and his limitations were not fully credible in light of the medical evidence, his failure to seek immediate medical attention, stop working and obtain Worker's Compensation from his 1997 accident, his failure to get medical attention for four years after he stopped working, his lack of medication despite complaints of chronic pain, his failure to see a neurologist for a neurological impairment, his failure to apply for disability for nine years, and the fact that he continues to drive and attend hunting trips despite his allegations of being markedly limited in his ability to sit, stand and walk. (AR 24-25.)

The ALJ found that Aragon had the RFC to perform light work – he can lift 20 pounds occasionally and 10 pounds frequently, he should avoid climbing ladders/ropes/scaffolds and extreme temperatures, he can occasionally kneel, crouch and crawl, and he experiences moderate pain, which is controllable with medication. (AR 23.) The ALJ concluded that Aragon could not perform his past work, but found he was not disabled because there were other jobs in the national economy of which he was capable, cashier and retail sales clerk. (AR 26.)

### III. STANDARD OF REVIEW

The Commissioner employs a five-step sequential process to evaluate SSI claims. 20 C.F.R. § 416.920; *see also Heckler v. Campbell,* 461 U.S. 458, 460-462 (1983). To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) claimant's RFC precludes him from performing his past work. 20 C.F.R. § 416.920(a)(4). At step five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. § 416.920(a)(4).

In this case, Plaintiff was denied at step five of the evaluation process. The step five determination is made on the basis of four factors: the claimant's RFC, age, education and work experience. *Hoopai*, 499 F.3d at 1074. "The Commissioner can meet this burden through the testimony of a vocational expert or by reference to the Medical Vocational Guidelines." *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)). The findings of the Commissioner are meant to be conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla but less than a preponderance." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). This is so because the ALJ "and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney,* 981 F.2d at 1019 (quoting *Richardson v. Perales*, 402 U.S. 389, 400 (1971)); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1198 (9th Cir.

2004). The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). Reviewing courts must consider the evidence that supports as well as detracts from the Commissioner's conclusion. *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).

## IV. ANALYSIS

As an initial matter, Aragon submits that this Court can consider evidence submitted to the Appeals Council when evaluating whether substantial evidence supports the ALJ's decision. Defendant agrees that this Court considers the evidence submitted to the Appeals Council in determining whether the ALJ's denial of benefits is supported by substantial evidence. *See Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993).

### A. 2008 Evidence

Aragon argues that the ALJ's RFC is not supported by substantial evidence because it did not account for his serious cervical spine condition, as revealed by the 2008 MRI and Dr. Branson's report. In particular, he contends the evidence is important because the two jobs that the ALJ concluded Aragon could perform involve frequent reaching and handling, and frequent or occasional fingering.

Aragon, however, does not point to anything in the 2008 evidence bearing on his ability to reach, handle or finger. Dr. Branson did not opine on Aragon's abilities in those realms. (AR 350-55.) Additionally, although the ALJ did not have benefit of the 2008 MRI of the cervical spine, he did have Dr. Aragon's diagnosis of chronic subluxations of the cervical spine with radicularopathy. (AR 346.) Further, although the MRI revealed degenerative disc disease, the ALJ found that Aragon's degenerative disc disease was a severe impairment.

Aragon has failed to substantiate his argument that – in light of the 2008 evidence regarding his cervical spine impairment – the ALJ's RFC finding is not supported by substantial evidence.

### B. Onset Date and Examining Physician, Dr. Silver

1    Aragon alleges it was error for the ALJ to use 1997 as the onset date of his disability
2 because his SSI application alleges January 15, 2005, as the onset of his disability. The ALJ
3 did not use 1997 as the onset date for purposes of evaluating Aragon's disability. He
4 accurately recited Aragon's onset date as January 15, 2005 (AR 19), and evaluated whether
5 he was disabled as of June 26, 2006, his filing date (AR 21, 27). These are the relevant dates
6 under the rules and as argued by Aragon. (*See* Doc. 16 at 12.)
7    In reviewing Aragon's history and assessing his credibility the ALJ noted that Aragon
8 asserted he was disabled as of 1997. This is an accurate representation of the record, as
9 Aragon repeatedly stated that he stopped working in 1997. (AR 34-35, 122, 252, 316.) As
10 pointed out by Aragon, he alleged an onset date of 2005 because benefits are not available
11 until after the filing date, therefore, earlier onset was irrelevant. (Doc. 16 at 12.) Although
12 2005 was the relevant date for purposes of the ALJ's analysis of disability, and he used the
13 correct date, there was nothing improper in the ALJ reviewing and considering the history
14 of Aragon's alleged disability.
15    Aragon also alleges that it was a factual error for the ALJ to state that he did not apply
16 for disability until 2006 (nine years after he stopped working) because he did file at least one
17 earlier application. The record reveals at least one prior application for disability benefits.
18 (AR 150.) Aragon does not provide any details regarding the date he first filed for disability,
19 however, based on the limited information in the record it appears to have been around early
20 2004. (AR 111.) The two-year differential in filings, 2004 rather than 2006, is
21 inconsequential to the point the ALJ was making – Aragon waited many years, seven not
22 nine, to file for disability from the time he was unable to work. Aragon makes a related
23 argument, that it was legal error for the ALJ to discredit him for not seeking disability
24 benefits at the earliest possible time. In support, Aragon cites only one non-controlling case,
25 *Sarchet v. Chater*, 78 F.3d 305, 308 (7th Cir. 1996), which does not clearly establish any
26 legal error. Aragon has not established that reliance on this factor was legally erroneous. To
27 the extent there was legal or factual error in this regard, it was harmless. *See Stout v.*
28 *Comm'r, Social Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (an error is harmless if it

1  was "irrelevant to the ALJ's ultimate disability conclusion."). Even if this finding was
2  removed from consideration, as discussed below, the ALJ's credibility finding was supported
3  by clear and convincing evidence. *See Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1197
4  (finding harmless a singular error when ALJ provided numerous reasons for credibility
5  finding).

6  Finally, Aragon argues the ALJ could not deny benefits based on facts adjudicated by
7  the prior ALJ without putting the prior decision and evidence in the record. Aragon failed to
8  point out any prior factual adjudications upon which the ALJ relied. The Court finds the
9  record is void of any such reference. Hence, there is no support for Aragon's claim that the
10 ALJ relied upon a prior administrative decision.

11 In light of his alleged 2005 onset date, and 2006 filing date, Aragon argues that,
12 although the ALJ could consider Dr. Silver's 1997 report, he erred in finding it relevant or
13 dispositive regarding his condition, his credibility and his RFC. The ALJ recounted Aragon's
14 medical history to the extent provided in the record, beginning with his back injury in 1982,
15 his electrocution in 1997, and all available subsequent records. (AR 21-22.) In evaluating Dr.
16 Thrasher's 2006 findings, the ALJ noted they were consistent with Dr. Silver's 1998
17 objective findings. (AR 24.) That was the only basis for which the ALJ relied on Dr. Silver's
18 examination; it was minimally relevant to his credibility finding. Dr. Silver did not opine on
19 Aragon's functional limitations and the ALJ did not explicitly rely on anything from Dr.
20 Silver in determining Aragon's RFC. It was reasonable for the ALJ to assess Plaintiff's
21 impairment(s) in light of his entire history, and Aragon has not pointed to any legal error
22 committed by the ALJ.

23 **C. Examining Physician, Dr. Escobar**

24 Aragon argues the ALJ erroneously evaluated Dr. Escobar's opinion. The ALJ
25 summarized the objective findings of Dr. Escobar:

26 15 degree[s] of forward flexion in the cervical spine and 50 degrees of forward
   flexion in the lumbar spine . . . slightly decreased sensation in the right upper
27 and lower extremities. However, deep tendon reflexes were symmetrical in the
   upper and lower extremities; muscle strength, though mildly reduced in the
28 upper and lower extremities (4/5), was essentially equal, left versus right; and

- 10 -

> he was able to stand on his toes and heels and on one leg. Straight-leg raising was normal.

(AR 24.) The ALJ concluded that Dr. Escobar's opinion – that Aragon could not perform even sedentary work – was not supported by the objective medical evidence:

> the objective evidence in the record does not support the finding of marked functional limitations. Accordingly, it is due little probative weight. Furthermore, the undersigned notes that Dr. Escobar's evaluation was somewhat inconsistent with the other evidence in the record. It is unclear why the claimant would suddenly, without an intervening injury, have restricted range of motion in 2007 after years of unrestricted range of motion earlier on. Although the record is silent on the matter, it is possible that the evaluation was purchased by the claimant with the hope of bolstering his claim for disability. If this were the case, there would be reason to question the objectivity of the report's conclusions.

(AR 25.) It is this analysis with which Aragon takes issue, on the basis that it is not supported by substantial evidence and the ALJ committed legal error.

As set forth in the factual summary above and the ALJ's decision, the opinion of Dr. Escobar was contradicted by other doctor's opinions in the record. However, the ALJ was required to provide "specific and legitimate reasons," supported by substantial evidence, to reject the opinion of examining physician Escobar. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). The Court finds the ALJ satisfied this standard.

First, the ALJ reviewed the entirety of the objective medical evidence – which included Drs. Silver and Thrasher's findings of normal range of motion, normal neurological exam, negative straight-leg raising, and an ability to walk on his heels and toes. The subsequent 2008 examination by Dr. Branson concurred that Aragon's neck flexion was full. (AR 351.) Thus, there was substantial evidence supporting the ALJ's conclusion that Dr. Escobar's findings regarding limited range of motion were aberrational.

As pointed out by Aragon, Dr. Branson was in agreement with some of Dr. Escobar's findings, such as diminished upper and lower extremity reflexes and motor strength, as well as diminished sensation in his leg. However, the ALJ concluded that these findings did not indicate significant impairment. (AR 24.) In particular, he noted that reflexes were symmetrical and the muscle strength was only mildly reduced and, again, essentially equal between left and right. (*Id.*) Additionally, as noted above, there was substantial other medical

- 11 -

1  evidence that Aragon's limitations were not as substantial as found by Dr. Escobar.

2  Aragon argues that it was improper for the ALJ to conclude that Dr. Escobar's
3  objective findings did not support the doctor's finding of marked functional limitations
4  because this was beyond the scope of the ALJ's role and amounted to playing doctor. To the
5  contrary, the ALJ retains the ultimate responsibility for assessing a claimant's RFC, 20
6  C.F.R. § 416.927(e)(2), based on all the record evidence, including medical sources,
7  examinations, and information provided by the claimant and lay witnesses, 20 C.F.R.
8  § 416.945(a)(1)-(3). The ALJ's conclusion that the doctor's opinion on Aragon's functional
9  limitations and the doctor's medical records were incongruous is a legitimate basis for
10 rejecting his opinion. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

11 Next, Aragon contends the ALJ failed to take into account that Dr. Escobar was board
12 certified in physical medicine and rehabilitation, and that he spent two hours examining
13 Aragon (in contrast to Dr. Thrasher's twenty-minute exam). Both Drs. Thrasher and Escobar
14 had relevant specializations, however, the ALJ did not rely on that to give weight to, or
15 detract from, their opinions. While expertise is a factor to be considered, in this case it does
16 not undermine the substantial evidence supporting the ALJ's finding. The ALJ acknowledged
17 Aragon's testimony on the length of the examinations; however, Aragon does not explain
18 why that factor necessarily is entitled to any particular weight. Further, even if it is of
19 relevance, it does not undermine the substantial evidence supporting the ALJ's analysis.

20 Aragon makes several specific, albeit cursory, arguments related to the substantial
21 evidence analysis, however, they do not undermine the Court's finding. First, Aragon
22 contends the ALJ failed to take into account that his treating chiropractor was in agreement
23 with Dr. Escobar's opinions. The ALJ cited to the evidence from Dr. Aragon (AR 22),
24 although he did not specifically note the chiropractor's one cursory statement that he agreed
25 with the limitations found by Dr. Escobar. (AR 346.) This evidence from an "other medical
26 source" does not weigh so heavily as to undermine the substantial evidence supporting the
27 ALJ's findings.

28 Second, Aragon argues the ALJ failed to explain why it rejected Dr. Escobar's

- 12 -

1    diagnosis of complex regional pain syndrome. The ALJ acknowledged the diagnosis in
2    summarizing the evidence but did not rely on it with respect to any of his findings. (AR 22.)
3    Aragon fails to explain what impact acceptance of the diagnosis would have had on the
4    ALJ's analysis. He does not argue that the ALJ should have found complex regional pain
5    syndrome to be a severe impairment at step two, nor does he allege that the ALJ failed to
6    discuss Dr. Escobar's testing results and his opinions on Aragon's limitations (which,
7    presumably, were based on the doctor's diagnosis). Additionally, to the extent the ALJ
8    implicitly rejected the diagnosis of complex regional pain syndrome, that conclusion was
9    supported by substantial evidence in the record. Dr. Escobar's singular exam was the only
10   evidence in the record supporting such a diagnosis, which was true for several of his findings
11   and opinions, and he overstated Aragon's functional limitations.

12   Aragon also asserts the ALJ committed legal error in evaluating Dr. Escobar's
13   opinion. First, he argues the ALJ should not have relied on Dr. Silver's report, in rejecting
14   Dr. Escobar's opinion, because it was not germane to his condition in 2005 and 2006. As
15   discussed in Section IV(B), the Court rejects this argument. Second, Aragon argues that it
16   was improper for the ALJ to reject Dr. Escobar's opinion based on his speculation that
17   Aragon purchased the examination. The basis for obtaining a particular medical opinion, or
18   the fact that it was procured by the claimant, is not a proper basis for rejecting the opinion.
19   *Lester*, 81 F.3d at 832. The ALJ stated only that if the examine was purchased to bolster
20   claimant's disability claim that would be a ground to reject it. (AR 25.) His statement was
21   erroneous in light of the governing law, however, he acknowledged that he was speculating
22   and did not clearly rely on this reasoning.

23   The Court finds, after review of the entirety of the record and the ALJ's decision, that
24   the ALJ did not err in evaluating Dr. Escobar's opinions.

25   **D. <u>Lay Witness Testimony</u>**

26   Plaintiff argues it was error for the ALJ to reject the lay witness testimony without
27   providing sufficient reasons. In assessing how a claimant's impairment impacts his ability
28   to work, ALJs consider non-medical sources such as friends. 20 C.F.R. § 416.913(d)(4).

1  Thus, ALJs must consider lay witness testimony and rejection of lay testimony requires
2  reasons specific to each witness. *Stout*, 454 F.3d at 1053.
3        The various lay witnesses reported that Aragon was unable to do much around the
4  house, he experienced significant pain, small tasks caused lingering pain, and his ability to
5  use his hands had diminished. The ALJ made the following statement relevant to lay witness
6  testimony:

> Although Dr. Thrasher found that the claimant retained the capacity for medium-level exertion and state agency medical consultants found that the claimant's impairment was "not severe," the undersigned having carefully considered all of the medical evidence in the record, as well as the claimant's testimony at the hearing and the statement's of the claimant's friends and relatives, finds that the claimant, though not disabled, is more significantly limited than had earlier been found.

11 (AR 25.)
12        Contrary to Aragon's argument, the ALJ credited and gave weight to the testimony
13  of the lay witnesses. The ALJ provided specific reasons for rejecting Dr. Escobar's opinion
14  that Aragon was unable to perform even sedentary work and for finding Aragon not entirely
15  credible regarding the limiting effect of his pain. Despite those findings, the ALJ found the
16  claimant was more limited than Dr. Thrasher concluded based, in part, on the lay witness
17  testimony. The ALJ did not error in his consideration of the lay witness statements.

### E. Credibility

19        The ALJ found that Aragon's statements regarding the effect of his symptoms and his
20  limitations were not fully credible. (AR 24-25.) Aragon argues that this credibility finding
21  is not supported by substantial evidence.
22        In general, "questions of credibility and resolution of conflicts in the testimony are
23  functions solely" for the ALJ. *Parra v. Astrue,* 481 F.3d 742, 750 (9th Cir. 2007) (quoting
24  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)). However, "[w]hile an ALJ may
25  certainly find testimony not credible and disregard it . . . [the court] cannot affirm such a
26  determination unless it is supported by specific findings and reasoning." *Robbins v. Soc. Sec.*
27  *Admin.,* 466 F.3d 880, 884-85 (9th Cir. 2006); *Bunnell v. Sullivan*, 947 F.2d 341, 345-346
28  (9th Cir. 1995) (requiring specificity to ensure a reviewing court the ALJ did not arbitrarily

1  reject a claimant's subjective testimony); SSR 96-7p. "To determine whether a claimant's
2  testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-
3  step analysis." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the
4  ALJ must determine whether the claimant has presented objective medical evidence of an
5  underlying impairment 'which could reasonably be expected to produce the pain or other
6  symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell,* 947 F.2d at 344). The ALJ found Plaintiff
7  had satisfied part one of the test by proving an impairment that could produce the symptoms
8  alleged. (AR 24.) Second, if "there is no affirmative evidence of malingering, the ALJ can
9  reject the claimant's testimony about the severity of her symptoms only by offering specific,
10 clear and convincing reasons for doing so." *Tommasetti v. Astrue,* 533 F.3d 1035, 1039 (9th
11 Cir. 2008) (quoting *Smolen*, 80 F.3d at 1281, 1283-84). The ALJ did not make a finding that
12 Aragon was malingering; therefore, to support his discounting of Aragon's assertions
13 regarding the severity of his symptoms, the ALJ had to provide clear and convincing, specific
14 reasons. *See Vasquez v. Astrue*, 547 F.3d 1101, 1105 (9th Cir. 2008) (quoting *Lingenfelter*,
15 504 F.3d at 1036).

16     "The ALJ must specifically identify what testimony is credible and what testimony
17 undermines the claimant's complaints." *Morgan v. Comm'n of Soc. Sec. Admin.*, 169 F.3d
18 595, 599 (9th Cir. 1999). When assessing a claimant's symptoms, the ALJ should consider,
19 in addition to objective medical evidence, his daily activities; the location, intensity,
20 frequency and duration of the symptom; factors that trigger or exacerbate the symptom; the
21 effectiveness of any medication to alleviate the symptom and any side effects; treatment the
22 claimant receives for relief of the symptom; any steps other than treatment used to relieve the
23 symptom (such as lying down or changing position); and any other factors relevant to
24 claimant's limitations due to the symptom. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. In
25 assessing credibility the ALJ can also consider the claimant's "reputation for truthfulness,
26 inconsistencies either in his testimony or between his testimony and his conduct, his daily
27 activities, his work record, and testimony from physicians and third parties concerning the
28

nature, severity, and effect of the symptoms of which he complains." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (citing *Smolen*, 80 F.3d at 1284).

The ALJ's finding that Aragon was not entirely credible regarding his pain and limitations was based on the medical evidence; his failure to seek immediate medical attention, stop working and obtain Worker's Compensation from his 1997 accident; his failure to get medical attention for four years after he stopped working; his lack of medication despite complaints of chronic pain; his failure to see a neurologist for a neurological impairment; his failure to apply for disability for nine years; and the fact that he continues to drive and attend hunting trips despite his allegations of being markedly limited in his ability to sit, stand and walk. (AR 24-25.)

Aragon argues the credibility finding is flawed because the ALJ erroneously evaluated the medical evidence, Aragon's disability onset date, and the lay witness statements. As set forth above, the ALJ did not err in evaluating the medical evidence, Aragon's onset date or the lay witness statements. Further, there is clear and convincing evidence to support his credibility finding regardless of the lay witness statements.

Aragon contends the ALJ should not have relied on his failure to seek immediate medical treatment upon electrocution. He does not contend this finding was not supported by substantial evidence, in fact he acknowledges the facts to be true. Rather, he argues it is not relevant to his credibility, particularly because he had no meaningful work history after that injury. This finding is one of several related points upon which the ALJ relied, all of which together reveal a pattern of failure to seek meaningful medical treatment over the course of many years, despite his assertion of disabling pain. There is clear and convincing evidence in the record to support the ALJ's findings that Aragon did not seek immediate treatment; did not obtain ongoing treatment for four years; and did not see a neurologist or take prescription medication until 2008, more than ten years after he stopped working. Aragon has not provided a meaningful explanation for his lack of treatment, and the ALJ can properly rely on such evidence in finding a claimant not credible. *See Fair v. Bowen*, 885

F.2d 597, 603 (9th Cir. 1989); *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (relying on minimal use of pain medication).

Credibility determinations are the province of the ALJ, even if other record evidence could by used to justify a contrary conclusion: "[w]here, as here, the ALJ has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision." *Fair*, 885 F.2d at 604.

## V. CONCLUSION

The Court concludes the ALJ's findings are supported by substantial evidence and there is no legal basis for reversing or remanding his decision. It is not certain, based on the record before the Court, that Aragon can work; however, he has not established that the ALJ erred in finding that he was not disabled as defined by the social security guidelines. Therefore, Aragon is not entitled to relief.

## VI. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends the District Court, after its independent review, enter an order denying Plaintiff's request to reverse the Commissioner's final decision and dismiss the case.

Pursuant to Federal Rule of Civil Procedure 72(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CV-10-307-TUC-CKJ**.

DATED this 1st day of July, 2011.

D. Thomas Ferraro
United States Magistrate Judge